# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7820 | **DATE** | 8/14/2001 |
| **CASE TITLE** | LaSalle Bank National Assoc vs. Martin Epstein | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's Motion for Summary Judgment is Granted (#55). It is further ordered that Plaintiff's Cross-Motion for Summary Judgment be, and the same hereby is, Denied (#59). Mr. Epstein's Motion to Strike is Denied as Moot (#77).

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices: 3

AUG 1 ? 2001 date docketed

docketing deputy initials: IS

FD-7 FILED FOR DOCKETING
01 AUG 14 PM 1: 39

Date/time received in central Clerk's Office

courtroom deputy's initials: AC

date mailed notice: 8/14/2001

mailing deputy initials: AC6

Document Number: 101

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LASALLE BANK NATIONAL ASSOCIATION | ) ) | No. 99 C 7820 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| MARTIN EPSTEIN, | ) ) | Magistrate Judge Arlander Keys |
| | ) ) | |
| Defendant. | ) ) | |

AUG 1 5 2001

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Martin Epstein's Motion for
Summary Judgment; Plaintiff LaSalle Bank National Association's
("LaSalle") Cross-Motion for Summary Judgment on the Issue of Duty;
LaSalle's Motion for Summary Judgment on All Remaining Issues; and
Mr. Epstein's Motion to Strike. LaSalle sued Mr. Epstein,
individually, for one count of negligent misrepresentation, arising
from alleged inaccurate financial information contained in daily
Collateral Reports and financial statements,[1] submitted by Mr.

---

[1] Mr. Epstein argues that the Verified Complaint, filed on
December 1, 1999, only mentions one claim for negligent
misrepresentation arising from alleged inaccuracies in daily
Collateral Reports and, significantly, does not mention anything
about "financial statements." Therefore, Mr. Epstein argues in
his Motion to Strike that LaSalle cannot add new claims in a
Summary Judgment Motion without first amending the Verified
Complaint. However, because the Court finds that Mr. Epstein had
no legal duty to provide accurate financial information to
LaSalle, it is immaterial whether the allegations involve only

101

Epstein to LaSalle, pursuant to a Loan Agreement between LaSalle and Mr. Epstein's former employer, PSI Industries, Inc. ("PSI"). For the reasons discussed below, the Court finds that Mr. Epstein was not in the "business of supplying information" and, therefore, had no legal duty to provide accurate financial information to LaSalle. Therefore, the Court grants Mr. Epstein's Motion for Summary Judgment, and denies LaSalle's Cross-Motion for Summary Judgment on the Issue of Duty. Furthermore, because the Court concludes, for the reasons discussed *infra*, that Mr. Epstein had no legal duty to provide accurate information to LaSalle, the Court denies LaSalle's Cross-Motion for Summary Judgment on All Remaining Issues, and Mr. Epstein's Motion to Strike, as moot, and will not substantively address them.

### FACTUAL BACKGROUND[2]

LaSalle seeks to recover a loan deficiency, alleged to be in

_____

the daily Collateral Reports or the financial statements as well.

[2] Both parties have submitted hundreds of pages of documents/exhibits detailing the factual background and legal arguments concerning this case. However, because the Court finds that Mr. Epstein had no legal duty to provide accurate information to LaSalle, many of these documents/exhibits are irrelevant to the Court's analysis. Accordingly, the Court will only discuss the facts and legal arguments that are germane as to whether Mr. Epstein had a legal duty to provide accurate information to LaSalle.

excess of five million dollars, from Mr. Epstein personally. In or about September 1998, LaSalle entered into a Loan and Security Agreement ("Loan Agreement") with PSI, Mr. Epstein's former employer. (Defendant's Local Rule 56.1 Statement of Material Facts ("Def.'s SMF") ¶ 9.) Pursuant to the Loan Agreement, LaSalle agreed to extend PSI a secured revolving line of credit in the amount of twelve million dollars. (*Id.*) Mr. Epstein was not involved in the negotiation of the revolving line of credit extended to PSI by LaSalle, and he did not attend the closing of the loan. (Def.'s SMF ¶ 10.) Furthermore, since he was not a party to the revolving line of credit, he did not execute the Loan Agreement either individually or on behalf of PSI. (Def.'s SMF ¶ 11.) Significantly, he did not execute any personal guarantee for the PSI line of credit, and, in fact, no officer, director, and/or employee of PSI executed such a personal guarantee. (Def.'s SMF ¶ 12.)

The amount of available credit to PSI under the Loan Agreement was determined by a percentage of PSI's "eligible" account receivables and inventory ("Collateral"). (Def.'s SMF ¶ 14.) As such, the Loan Agreement required PSI to submit daily Collateral Reports to LaSalle detailing the changes in value of the Collateral. (Def.'s SMF ¶¶ 15-16.) Mr. Epstein, as a Director and

Chief Financial Officer ("CFO") of PSI, signed most of the Collateral Reports on behalf of PSI.[3] (Def.'s SMF ¶ 19.) According to LaSalle, Mr. Epstein, as CFO *and as a certified public accountant* ("CPA")[4], certified that the information contained in

---

[3] Mr. Epstein was CFO of PSI from July 1998 until February 2000. (Defendant's Reply to Additional Facts Raised in Plaintiff's Response to His Local Rule 56.1 Statement ("Def.'s Reply") ¶ 7.) He signed all but three of the 214 Collateral Reports submitted between September 18, 1998 and July 29, 1999. (Plaintiff's Response to Def.'s 56.1 Statement of Material Facts ("Pl.'s Resp.") ¶ 2.)

[4] The parties disagree as to whether Mr. Epstein was acting as a CPA (i.e. accountant) in his position as CFO and a Director of PSI. Indeed, this is one of the primary arguments raised by Mr. Epstein in his Motion to Strike. Mr. Epstein argues that the Verified Complaint never mentions that he is being sued in his capacity as a CPA, as opposed to being a CFO and a Director of PSI, and that LaSalle cannot argue in its Motion for Summary Judgment that he is being sued in his capacity as a CPA without first amending its Verified Complaint. While not ruling on the Motion to Strike, the Court finds, as discussed *infra*, that Mr. Epstein was not, in fact, acting as an accountant in his position as CFO of PSI. Significantly, Mr. Epstein was not a licensed CPA in Florida, where he worked as the CFO and a Director of PSI. (Def.'s Reply ¶ 2.) (During the relevant time period, PSI was a Florida corporation with its principal place of business in Boca Raton. (Def.'s SMF ¶ 6.)) Furthermore, even if Mr. Epstein were a licensed CPA at the relevant time, under applicable Florida law and SEC Rules, he could not engage in public accounting while working as CFO of PSI. (Def.'s Reply ¶ 2.) Significantly, Mr. Epstein never used the CPA designation on any of the Collateral Reports that he signed as CFO of PSI. Most telling is that LaSalle required (in the Loan Agreement) PSI to hire *outside accountants* for its annual audits, and LaSalle, apparently, is suing the outside accountants in a separate cause of action to recover part of the loan deficiency. (*See* Motion to Strike at 12-13.)

the Collateral Reports was accurate (Pl.'s Resp. ¶ 16), and that it relied on Mr. Epstein's signatures as to the accuracy of the Collateral Reports and financial statements in extending PSI a revolving line of credit. In sum, Mr. Epstein's signatures on the Collateral Reports represent the factual basis for LaSalle's contention that it has a cause of action to recover PSI's loan deficiency against Mr. Epstein individually.

According to LaSalle, PSI employees, officers and directors – *other than Mr. Epstein* – engaged in a fraudulent scheme to inflate the amount of eligible account receivables and inventory in order to induce LaSalle to extend more credit to PSI than was available under the Loan Agreement.[5] (Def.'s SMF ¶ 20.) LaSalle asserts that in reliance upon the accuracy of the daily Collateral Reports – signed by Mr. Epstein – (and financial statements prepared and/or provided to LaSalle by Mr. Epstein), it extended credit to PSI materially in excess of the Loan Formula, when PSI was not eligible to receive funds under the Loan Agreement. (Def.'s SMF ¶ 21; Pl.'s Resp. ¶ 23.)

By letter dated June 7, 1999, Casey Orlowski, a Vice President

---

[5] The specific details of this alleged scheme to defraud – which undisputedly did not involve Mr. Epstein – are irrelevant to the analysis of whether Mr. Epstein had a duty to provide accurate information to LaSalle.

of LaSalle and the primary Loan Officer for the PSI line of credit, advised Ben Cohen, who at that time was Chief Executive Officer and President of PSI, that a default had occurred under the Loan Agreement (Def.'s Memorandum in Support of His Summary Judgment Motion at 2.) Specifically, Mr. Orlowski wrote that PSI no longer maintained sufficient collateral to support the amount of the loans, and its tangible net worth had dropped below the Minimum Tangible Net Worth as stated in the Loan Agreement. (*Id.*) In July 1999, PSI filed for protection under the United States Bankruptcy Code. (Def.'s SMF ¶ 25.) The PSI bankruptcy is still pending, and LaSalle is PSI's primary secured creditor in the amount of PSI's loan deficiency.

## PROCEDURAL BACKGROUND

On December 1, 1999, LaSalle filed its Verified Complaint in federal court for one count of negligent misrepresentation against Mr. Epstein.[6] (Def.'s SMF ¶ 28.) LaSalle seeks purely economic damages which may amount to $5,000,000, including interest, costs and attorney's fees. (Def.'s SMF ¶ 29; Pl.'s Resp. ¶ 29.) On

---

[6] The Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332 (West 2001), in that there is complete diversity between the parties and the amount in controversy is over $75,000. Accordingly, the Court will apply the substantive law of Illinois in analyzing LaSalle's claim of negligent misrepresentation. *See Fremont Financial Corp. v. IPC/Levy, Inc.*, 994 F. Supp. 988, 990 (N.D. Ill. 1998).

January 21, 2000, Mr. Epstein filed a motion to dismiss LaSalle's Verified Complaint, which was denied by the district court on March 8, 2000. (Def.'s SMF ¶¶ 30-31.) On February 1, 2001, Mr. Epstein filed his Motion for Summary Judgment, and on March 15, 2001, LaSalle filed its Cross-Motion for Summary Judgment on the Issue of Duty. On April 6, 2001, LaSalle filed its Motion for Summary Judgment on All Remaining Issues. Finally, on April 19, 2001, Mr. Epstein filed his Motion to Strike.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the initial burden of showing that the record contains no genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to show, through specific facts in the record, that there is "a genuine issue for trial." *Id.* at 324. The Court examines the record in a light most favorable to the non-movant, but conclusory allegations without evidentiary support will not suffice. *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999). In this case, both parties have moved for summary judgment on the issue of duty.

**B.  Negligent Misrepresentation and the *Moorman* Doctrine**

To establish a cause of action for negligent misrepresentation, LaSalle must prove that (1) Mr. Epstein owed LaSalle a duty to communicate accurate information; (2) Mr. Epstein made false statements of material fact; (3) Mr. Epstein was negligent in ascertaining the truth or falsity of its statements; (4) LaSalle relied on the false statements; and (5) LaSalle was damaged by its reliance. *See General Elec. Capital, Corp. v. Equifax Services, Inc.*, 797 F. Supp. 1432, 1440 (N.D. Ill. 1992)(citation omitted). Significantly, the existence of a legal duty (element one) is a question of law to be decided by the Court. *Id.* at 1438. Hence, both parties have filed cross-motions for summary judgment exclusively on this issue.[7]

It is undisputed that Mr. Epstein signed no contract with LaSalle, and that LaSalle seeks damages solely for economic loss in its tort claim for negligent misrepresentation. "Economic loss" is defined as "damages for inadequate value, costs of repair and replacement of defective product, or consequent loss of profits –

---

[7] As explained *supra*, LaSalle also requests summary judgment on all remaining elements (other than duty) dealing with its negligent misrepresentation claim. However, because the Court finds that Mr. Epstein did not have a duty (element one), it is unnecessary to address LaSalle's second summary judgment motion dealing with the remaining elements of the negligent misrepresentation claim.

without any claim of personal injury or damage to other property .

. . ". *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443, 449

(1982). The well-settled *Moorman* doctrine (or economic loss

doctrine) provides that a "plaintiff cannot recover for solely

economic loss under the tort theories of . . . negligence"."[8] *Id.*

at 453; *see also id.* at 451 (stating that the policy underlying the

rule against recovery of economic losses in tort is that "contract,

rather than tort, law provides the appropriate set of rules for

recovery").

---

[8] As succinctly stated in *Nepomoceno v. Knights of Columbus*,
No. 96-C-4789, 1999 WL 66570, at * 11 (N.D. Ill. Feb. 8, 1999):
> In a nutshell, [the economic loss] doctrine bars a
> plaintiff from recovery in negligence for losses which
> are purely economic, that is, do not involve personal
> injury or property damage. In other words, tort law is
> not intended to compensate parties for monetary losses
> suffered as a result of duties which are owed to them
> simply as a result of a contract.

Here, LaSalle's losses are purely economic, as they do not
concern personal injury or property damage. Rather, LaSalle
seeks to recover from Mr. Epstein, individually, for a loan
deficiency based on a Loan Agreement (or contract) between
LaSalle and PSI, Mr. Epstein's former employer. Obviously,
LaSalle cannot sue Mr. Epstein in contract, as he was not a party
to the contract. Importantly, "the *Moorman* rule applies even in
the absence of an alternative remedy in contract." *2314 Lincoln
Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*,
555 N.E.2d 346, 350 (1990); *see also Anderson Elec., Inc. v.
Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (1986)("A plaintiff
seeking to recover purely economic losses due to defeated
expectations of a commercial bargain cannot recover in tort,
regardless of the plaintiff's inability to recover under an
action in contract.").

However, there are exceptions to the *Moorman* doctrine. According to the Illinois Supreme Court, a tort claim of negligent misrepresentation may constitute an exception to the *Moorman* doctrine under two circumstances: (1) the defendant "intentionally made false representations" and/or (2) "where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent misrepresentations." *Moorman*, 435 N.E.2d at 452; *see also Tolan and Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 294 (Ill. App. Ct. 1999) ("[N]egligent misrepresentation by a defendant in the business of supplying information for the guidance of others in business transactions is an exception to the *Moorman* doctrine.") (citation omitted).

In the case *sub judice*, LaSalle does not allege that Mr. Epstein made any intentional (as opposed to negligent) misrepresentations. In fact, to the contrary, LaSalle alleges that certain employees and directors of PSI, other than Mr. Epstein, engaged in the fraudulent scheme to inflate the amount of eligible receivables and inventory. (Def.'s SMF ¶ 20.) Therefore, in order for LaSalle to proceed on its cause of action for negligent misrepresentation, it must establish that Mr. Epstein was "in the business of supplying information" and, consequently, had a duty to

provide accurate information to LaSalle. *See 2314 Lincoln Park West, supra,* 555 N.E.2d at 351("It would appear that the concept of duty is at the heart of the distinction drawn by the economic loss rule.")

### C. Exception to the *Moorman* Doctrine: Business of Supplying Information.

The crux of this controversy, therefore, depends on whether Mr. Epstein was in the business of supplying information. If he is found to be in the business of supplying information, then Illinois courts imply a duty to communicate accurate information. *See Fremont Financial Corp., supra,* 994 F. Supp. at 992; *General Elec. Capital, supra,* 797 F. Supp. at 1440. The requirement that the defendant be in the business of supplying information must be strictly construed, lest the exception swallow the rule. *Gerdes v. John Hancock Mut. Life Ins. Co.,* 712 F. Supp. 692, 699 (N.D. Ill. 1989). In analyzing whether a party is in the business of supplying information, courts have determined three distinct scenarios: (1) a party is in the business of supplying information when its product consists solely of information; (2) a party whose regular business is to provide tangible, non-informational products is not in the business of supplying information; and (3) a party may be in the business of supplying information if its business is

in between these two extremes and includes both information and non-informational goods or services. *Tolan and Son, supra*, 719 N.E.2d at 296-97; *see also Rankow v. First Chicago Corp.*, 870 F.2d 356, 364-65 (7th Cir. 1989).

In the case *sub judice*, PSI was undisputedly in the business of wholesale distribution and manufacture of certain kinds of cameras, film, and photographic equipment – tangible products. (Def.'s SMF ¶ 6.) PSI's regular business, therefore, was clearly involved in non-informational goods. *See General Elec., supra,* 797 F. Supp. at 1441 ("[Company] was a manufacturer of tangible goods and not in the business of furnishing information; hence, no duty arose to provide accurate information."); *Coleman Cable Systems, Inc. v. Shell Oil Co.*, 847 F. Supp. 93, 95 (N.D. Ill. 1994)("To date, no manufacturer of tangible noninformational goods has been held to be in the business of supplying information.").

LaSalle, however, vehemently maintains that its cause of action is against Mr. Epstein personally, as an accountant, CFO, and a Director of PSI, and not against PSI. According to LaSalle, since Mr. Epstein provided information to LaSalle (in the form of certifying daily Collateral Reports and financial statements), then Mr. Epstein was in the business of supplying information (even though his employer, PSI, was not), and, therefore, falls under the

-12-

exception to the *Moorman* doctrine. The critical problem with LaSalle's good-faith argument, however, is that it has been rejected previously by district courts in this jurisdiction.

The most damaging case to LaSalle's position is *First Nat. Bank of Boston v. Une,* No. 87 10831, 1988 WL 130050 (N.D. Ill. Nov. 23, 1988). In *Une,* the court held that officers of corporations that provide a bank with corporate financial information in order to obtain financing for the corporation are not in the business of supplying information, and, therefore, the *Moorman* doctrine bars a claim against a financial officer for negligent misrepresentation. 1988 WL 130050, at *5. Specifically, in *Une*, the plaintiff bank alleged that Hitoshi Une, the Vice President of Finance and Treasurer of Osawa and Company ("Osawa"), approached the plaintiff bank to secure a line of credit for Osawa. In connection with the request for the line of credit, the plaintiff bank alleged that Mr. Une, "or someone under his control . . . [provided the plaintiff bank with] financial statements, including balance sheets and profit and loss statements . . . credit applications and all other documents required by [plaintiff bank's] internal loan regulations . . .". *Id.* at *1. The plaintiff bank further claimed that Mr. Une made oral misrepresentations about the amount of accounts receivable. *Id.* On the basis of the information provided by Mr.

Une, as well as its own independent investigation, the plaintiff bank entered into a contract where it agreed to extend a line of credit to Osawa up to $2,000,000 for the operation of Osawa's business. *Id.*

As in the case *sub judice*, Osawa filed for bankruptcy, leaving the plaintiff bank as a secured creditor in the amount of Osawa's loan deficiency. The plaintiff bank argued that it should be allowed to recover against Mr. Une personally, because he negligently provided the plaintiff bank with inaccurate financial information in connection with the line of credit extended to his corporate employer, Osawa. Identical to the case at bar, the plaintiff bank maintained that Mr. Une owed it a duty to supply accurate financial information, and that Mr. Une "failed to exercise ordinary care to insure that the information transmitted to [plaintiff bank] about Osawa's financial condition was true and accurate." *Id.* at * 1.

The court, however, rejected the plaintiff bank's claim. While acknowledging that Mr. Une had, indeed, provided the plaintiff bank with financial information in connection with Osawa's request for a line of credit, the court concluded that Mr. Une, nonetheless, could not be considered in the "business of supplying information" so as to fit within the narrow exception to

the *Moorman* doctrine.   Specifically, the court held:

> Defendant did provide Plaintiff with information in connection with Osawa's request for a line of credit.  We do not think, however, that Section 552 of the Second Restatement of Torts[9] was intended to allow recovery against officers and treasurers of corporations whenever they provide a bank with corporate financial information in order to obtain financing for the corporation. Defendant is not in the business of providing information.  His job is not the same as a stockbroker or real estate agent.

*Id.* at * 3.   Therefore, the *Une* court granted Mr. Une's motion to dismiss the plaintiff bank's claim for negligent misrepresentation under the *Moorman* doctrine.

LaSalle attempts to distinguish this damaging case to no avail.   First, it argues that *Une* was decided on a motion to

---

[9] Section 552 of the Restatement (Second) of Torts, entitled "Information Negligently Supplied for the Guidance of Others", provides, in pertinent part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"While Section 552 of the second Restatement of Torts says that liability arises when one 'in the course of his business' supplies false information for guidance of others, [*Moorman* and *Penrod v. Merrill Lynch, Pierce, Fenner & Smith*, 385 N.E.2d 376 (Ill. App. Ct. 1979)] have construed that section to mean that the defendant must be in the business of supplying information." *National Union Fire Ins. Co. of Pittsburgh, Pa v. Continental Illinois Corp.*, 654 F. Supp. 316, 318 (N.D. Ill. 1987).

dismiss, and the case *sub judice* is on a summary judgment motion (and has already withstood a motion to dismiss).[10]   However, this distinction is immaterial, as the issue concerning duty is purely legal, and is not determinative on the stage of the litigation. LaSalle further attempts to distinguish *Une* by arguing that Mr. Une, apparently, only provided information *once* to the plaintiff bank, while Mr. Epstein certified *daily* Collateral Reports for a revolving line of credit.   However, in *Une*, there is absolutely no mention of the frequency of the information provided to the plaintiff bank by Mr. Une.    LaSalle is assuming that the information provided by Mr. Une was on a one-time basis.   In any event, there is no reason to think that the *Une* court would have decided the issue differently had Mr. Une provided daily information.   In other words, the holding in *Une* was not based on the frequency of information provided to the plaintiff bank, but rather on the fact that a corporate officer who provides financial information to secure financing, on behalf of his corporate

_____

[10]In any event, the district court noted, when denying the motion to dismiss, that it had "reservations about the ultimate success of LaSalle's negligent misrepresentation claim" and that "[a] decision regarding whether defendant is in the business of supplying information for the guidance of others in their business transactions is better suited for summary judgment than a motion to dismiss."    (District Court's Order, dated March 8, 2000, at 4-5.)

employer, is personally not in the business of supplying information so as to fall within the exception to the *Moorman* doctrine.[11]

Indeed, a similar conclusion was reached in *National Union, supra,* and *In re Ben Franklin Retail Stores, Inc.*, No. 97-C-7934, 2000 WL 28266 (N.D. Ill. Jan. 12, 2000). In *National Union*, insurers sought to file a counterclaim against a bank and its officials for indemnification because of negligent misrepresentations. The court asked the insurers to explain how such a negligent misrepresentation claim could be asserted in good faith given the narrow scope of the *Moorman* doctrine. 654 F. Supp. at 317. The court ultimately held that the bank (and, significantly, its officials charged with the alleged misrepresentations) could in no way be conceivably "characterized

---

[11] Furthermore, as pointed out by Mr. Epstein, Mr. Une, arguably, was *more* involved in the process of obtaining the loan for his corporate employer than was Mr. Epstein. Mr. Une, himself, approached the plaintiff bank to request a loan for his corporate employer, and Mr. Une personally negotiated the line of credit and executed the loan agreement on behalf of his employer. By contrast, Mr. Epstein, undisputedly, was not involved in the negotiations with LaSalle or even in the loan's closing or the Loan Agreement's execution. (In fact, LaSalle and PSI apparently were already involved in negotiations before Mr. Epstein was even hired.) Therefore, if the *Une* court found Mr. Une not to be in the business of supplying information when he was more involved in the negotiation and processing of the loan, then *a fortiori*, Mr. Epstein should not be found to be in the business of supplying information.

as 'in the business of supplying information for the guidance of others in their business transactions.'" *Id.* at 318. In fact, the court held that, if the bank "made the alleged misrepresentation in the course of its business, but its business was *not* itself the supplying of information", then the insurers' negligent misrepresentation claim was barred by the *Moorman* doctrine.[12] *Id.* (emphasis in original).

In the case *sub judice*, as in *National Union*, the alleged misrepresentations were made in the course of PSI's business (i.e. securing a loan or revolving line of credit), but its business itself was not in supplying information. Although the insurers in *National Union* attempted to sue the bank itself, as well as the bank's corporate officials, its cause of action was based on alleged misrepresentations made by the bank's officials – just as LaSalle's cause of action is based on alleged inaccurate financial statements made by PSI's corporate employee and CFO, Mr. Epstein. Importantly, the *National Union* court held that the bank and its officials were not in the business of supplying information.[13] The

---

[12]Indeed, the court in *National Union* even specifically admonished the insurers' counsel for pursuing a counterclaim in light of the *Moorman* doctrine. *See National Union*, 654 F. Supp. at 318, fn. 4.

[13] In *Rankow, supra*, 870 F.2d at 364-65, the Seventh Circuit
(continued...)

situation, here, is practically indistinguishable.

Additionally, in *In re Ben Franklin*, *supra*, the district court affirmed a decision by the Bankruptcy Court that had held that the *Moorman* doctrine barred a claim by institutional lenders for negligent misrepresentation, against various officers and directors (including the CFO) of a company, for misrepresenting the true value of the company's accounts receivable, thereby prolonging the company's corporate life beyond the point of solvency. 2000 WL 28266, at * 2, 5. The court held: "Where it is clear that the relationship between the parties is commercial because the alleged transactions and damages are financial in nature, the [institutional lenders'] negligence claim may not be asserted under Illinois law because of the *Moorman* doctrine." *Id.* at * 5 (citation omitted). While there was no mention of whether the officers and directors were in the business of supplying information *per se*, the critical point is that *In re Ben Franklin* represents another

---

[13](...continued)
distinguished *National Union*, noting that other cases had found banks – in certain circumstances – to be in the business of supplying information. However, *Rankow* significantly stated that *National Union* involved "information that clearly was not central to the business of the bank." *Id.* at 364. Again, here, PSI's quest for a loan, and Mr. Epstein's daily certifications of Collateral Reports, were not central to the business of PSI, which was the production and distribution of tangible photographic equipment.

example where lenders were barred from suing directors and officers of corporations individually for economic loss arising from a loan deficiency based on a negligent misrepresentation (or tort) theory.[14]

The courts have a rationale for drawing such conclusions: LaSalle should have protected itself *contractually* by having someone sign a personal guarantee. As eloquently explained in *Une, supra*:

> Although this case is not exactly the same as *Moorman* . . . as it relates to a loan rather than a product, we think by analogy the same result must obtain here. First, Plaintiff's claim here is qualitative. Just as the products in *Moorman* . . . did not meet the purchaser's expectation, so the bank's expectation regarding the risk of providing Osawa credit did not meet

---

[14]LaSalle erroneously argues that the *Moorman* doctrine and its factual circumstances concerning the sale of goods and warranty law have been misconstrued by later courts. Of course, understandably, LaSalle does not like the application of the *Moorman* doctrine in the context of this case, as it bars its cause of action. Nonetheless, *Une, National Union,* and *In re Ben Franklin, supra,* have applied the *Moorman* doctrine to bar a negligent misrepresentation claim where officers and directors of companies have allegedly made financial inaccuracies in relaying information to lenders on behalf of their corporate employers. Furthermore, the Illinois Supreme Court in *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.,* 679 N.E.2d 1197, 1200 (1997) reaffirmed the holding in *Moorman* (although it overruled the requirement that the information be supplied to third parties, which is irrelevant to this case), and reaffirmed that it applied to the service industry. (*Moorman* had concerned the sale of goods - not services.) While LaSalle can lament the state of the law, this Court will not go against the weight of authority which bars this cause of action.

its original expectation. Secondly, warranty law allows the parties to negotiate ex ante to address who will bear the burden should qualitative problems arise later with respect to products. *Similarly, here Plaintiff could have requested personal guarantees to further insure itself against the potential lack of credit worthiness of Osawa.* Thirdly, just as in *Moorman* . . ., Plaintiff is attempting to find relief from a transaction which, although appearing beneficial in the beginning, was, in hindsight, a bad bargain. Finally, we share the concerns raised in other cases that allowing a negligence suit (as opposed to a suit for fraud) in this situation will obliterate any distinction between contract and tort law and usher us into a new era which recognizes a tort of negligent contract negotiations.

1988 WL 130050, at *5 (emphasis added); *see also Bethlehem Steel Corp. v. Chicago Eastern Corp.*, 863 F.2d 508, 522 (7th Cir. 1988)("The thrust of *Moorman* is that commercial entities should bargain to allocate the risk of economic loss between themselves."). While LaSalle argues that *Moorman* does not mandate that it *must* protect itself contractually, *Moorman* clearly illustrates that, when purely economic injuries arise from a commercial relationship (or disappointed economic expectations), the injured party should look to contractual – and not tort – remedies.[15]

---

[15] Mr. Epstein further argues in his Summary Judgment Motion that he had no extra-contractual fiduciary duty to LaSalle, PSI's corporate lender. While this may be true, it is irrelevant, as LaSalle is not arguing that Mr. Epstein had an extra-contractual fiduciary duty, but rather that he is in the business of supplying information, and, therefore, falls within an exception

(continued...)

Despite the aforementioned cases which bar LaSalle's claim, LaSalle urges the Court to consider cases which are not on point.[16] In *Fireman's Fund, supra,* for instance, while the court does state - as argued by LaSalle - that the analysis as to whether the defendant is in the business of supplying information should focus on "the ultimate result of the professional's work", 697 N.E.2d at 1201, *Fireman's Fund* concerns an architect – not a corporation whose corporate officer made alleged inaccurate financial statements to a lender to secure a loan for his corporate employer. In *Fireman's Fund*, the court contrasted the work of a lawyer and accountant, which it found to be information-based and, thus, falling under the exception to the *Moorman* doctrine, with the

---

[15](...continued)
to the *Moorman* doctrine. Furthermore, because the Court finds that Mr. Epstein had no duty to provide accurate information to LaSalle (based on the *Moorman* doctrine), the Court need not address Mr. Epstein's additional argument that LaSalle's allegations only implicate "simple negligence" as opposed to "negligent misrepresentation."

[16] LaSalle also relies on its expert witness, Michael L. Goldberg, to argue that Mr. Epstein was personally in the business of supplying information. However, Mr. Goldberg's conclusory statement that Mr. Epstein was in the business of supplying information is immaterial, as this is a legal issue which cannot be unequivocally asserted by an expert witness. *See Nicholas J. Murlas Trust v. Mobil Oil Corp.*, No. 93 C 6956, 1995 WL 505468, at * 13 (N.D. Ill. Aug. 18, 1995)(stating that whether a defendant is in the business of supplying information constitutes a legal conclusion).

tangible product of an architect, which it found not to fall within the exception. *Id.* at 1201-1202. LaSalle would have the Court conclude that, since Mr. Epstein's primary work was providing information to LaSalle (as an accountant), he was personally in the business of supplying information, even though his employer was not. However, as explained *supra*, Mr. Epstein was not acting as an accountant in his capacity as CFO and a Director of PSI (in fact, he was precluded from acting as an accountant by applicable Florida law and SEC regulations).[17]

---

[17] LaSalle maintains that it believed that Mr. Epstein was acting as a CPA, because Mr. Epstein's resume, which he used in securing his position as CFO of PSI, discloses that he is a CPA, and that he was identified as a CPA in LaSalle's Loan Committee Request for Loan Approval presentation (although Mr. Epstein was not privy to the Loan Agreement). Therefore, according to LaSalle, it relied on Mr. Epstein's financial experience as a CPA in deciding to enter the Loan Agreement with PSI. However, as explained *supra*, while Mr. Epstein clearly had a financial background, he was not acting as a CPA in his capacity as a CFO of PSI, as he was precluded by SEC regulations and Florida law from acting as both PSI's CPA and CFO. *See* Fla.Stat.Ann. § 473.315 (West 2001)("A certified public accountant shall not express an opinion on the financial statements of an enterprise unless she or he and her or his firm are independent with respect to such enterprise.") In fact, LaSalle required PSI to have its year end financial statements audited and certified by an *outside* accounting firm in their Loan Agreement. Specifically, the Loan Agreement states, in pertinent part: "Borrower agrees to deliver to Bank the following financial information, all of which shall be prepared in accordance with generally accepted accounting principles . . . (iii) no later than seventy-five (75) days after the end of each of Borrower's fiscal years, audited annual financial statements with an unqualified opinion by *independent*

(continued...)

In any event, the cases which hold accountants liable for purely economic loss are either dealing with professional negligence claims (and not negligent misrepresentation claims *per se*) or, more importantly, dealing with the *primary* business of the defendant. For instance, in *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 515 (1994) - a case heavily relied on by LaSalle - the court held an accounting firm liable for *professional negligence* in preparation of financial statements, but did not address plaintiff's negligent misrepresentation claim. Furthermore, in *Congregation*, the defendant was an accounting firm, whose primary job was clearly information-based, and who had been retained by the plaintiff.

---

[17](...continued)

*certified public accountants* selected by Borrower and reasonably satisfactory to Bank, which financial statements shall be accompanied by a letter from such accountants acknowledging that they are aware that a primary intent of Borrower in obtaining such financial statements is to influence Bank and that Bank is relying upon such financial statements in connection with the exercise of its rights hereunder . . ." (Loan Agreement, Section 11(b), attached as Exhibit A to Appendix of Exhibits in Support of Epstein's Motion for Summary Judgment.)(Emphasis added.) While this section of the Loan Agreement also states that LaSalle was relying upon the CFO of Borrower to certify financial statements, LaSalle clearly knew - or should have known - that the CFO could not also act as an accountant for its own employer. Furthermore, as mentioned *supra*, LaSalle should have pursued more protections if it was exclusively relying on Mr. Epstein's certifications, such as having him sign a personal guaranty, or at least having him be a party to the contract.

Thus, there was an accountant-client relationship. Here, however, PSI was not an accounting firm, and any information provided in its loan transaction with LaSalle was purely incidental to its primary business: manufacturing and distributing photographic equipment. *See Fireman's Fund, supra,* 679 N.E.2d at 1201 ("The focus of *Moorman's* negligent misrepresentation exception to the economic loss doctrine is whether the defendant is in the business of supplying information for the guidance of others, or *whether the information that is supplied is merely ancillary to the sale or in connection with the sale of merchandise or other matter.*"(citation omitted)(emphasis added).

Of course, LaSalle maintains that its cause of action is against an individual corporate officer of PSI, and not PSI itself. LaSalle essentially argues that Mr. Epstein's primary job - or ultimate result of his professional work - was certifying daily Collateral Reports for LaSalle, and, therefore, his job was information-based. Significantly, however, LaSalle cites no case law where a corporate officer or CFO is held to be in a *different* business than his corporate employer for purposes of the *Moorman* doctrine exception. In fact, to the contrary, *Une, National Union,* and *In re Ben Franklin,* discussed *supra,* imply otherwise. In sum, the cases relied on by LaSalle are not in the context of a

*corporate officer/CFO* of a company that is not in the business of supplying information. Rather, in all the cases LaSalle cites favorably for its position, the defendant company's primary business was, in fact, in supplying some sort of information, and the plaintiff had specifically retained the defendant company for that information-related purpose.[18]

---

[18]For instance, in *Tolan and Son, supra,* 719 N.E.2d at 296 – a case relied on by LaSalle for the proposition that "[t]he supplying of information need not encompass the enterprise's entire undertaking but must be central to the business transaction between the parties" – the court held that a soil engineer and architect were not in the business of supplying information, because the information supplied by them was incidental to a tangible product, while accountants, attorneys, insurance brokers, stockbrokers, real estate brokers, termite inspectors, and environmental assessors – as pure information providers – are, indeed, in the business of supplying information. 719 N.E.2d at 296-97 (listing cases)(the court remanded the question of whether a structural engineer was in the business of supplying information). LaSalle cannot take arguably favorable language from a case that addresses an entirely factual inapposite scenario and apply it persuasively to the case *sub judice.* Additionally, in a footnote, LaSalle cites string citations where Illinois courts have permitted plaintiffs to pursue recovery under a negligent misrepresentation theory. However, all of these cases concern defendants whose primary business was in providing information, such as title insurance companies, actuaries, environmental assessors, appraisers, and inspectors. As explained *supra,* Mr. Epstein's situation is entirely distinguishable – he was a corporate officer of a company whose primary business had nothing to do with providing information. Furthermore, Mr. Epstein was not retained by LaSalle. Rather, LaSalle's relationship was solely with PSI. PSI, then, chose to have Mr. Epstein certify the daily Collateral Reports, although three of the 214 reports were signed by other PSI employees.

## CONCLUSION

For the reasons discussed above, the Court finds that Mr. Epstein had no legal duty to provide accurate information to LaSalle, because he was not in the business of supplying information. Therefore, the exception to the *Moorman* (or economic loss) doctrine does not apply, and LaSalle cannot recover purely economic losses under a tort (i.e. negligent misrepresentation) theory. Accordingly, the Court grants Mr. Epstein's Motion for Summary Judgment and denies LaSalle's Cross-Motion for Summary Judgment on the Issue of Duty. Finally, LaSalle's Motion for Summary Judgment on All Remaining Issues, as well as Mr. Epstein's Motion to Strike, are denied as moot.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Cross-Motion for Summary Judgment be, and the same hereby is, DENIED.


DATED: August 14, 2001        Enter:

ARLANDER KEYS
United States Magistrate Judge